Dowdell v. Imhof Good morning, your honors. My name is Joseph Covello. I'm with Lynn Gartner Dunning Covello and I'm here on behalf of the appellant county of Nassau. This matter to be reviewed by you today regards the excessiveness of a fee awarded by the trial court. In essence, we had a lawsuit that was commenced saying that Nassau County was tardy in processing its public assistance. There was no argument with that. That case was settled within a year thereafter, March 2011. Reports were being generated, being sent to our adversaries who were monitoring to make sure that we complied with the rules and regs, and Hurricane Irene hit in August of 2011. Shortly thereafter, we have a nor'easter. As a result of Irene, the applications for benefits skyrocket. At the same time, county is experiencing a financial difficulty, lays off 106 members of this department that are processing this. These are all the reasons why the county, as I understand it, suggested or informed the plaintiff's counsel that it could not yet comply with the terms of the consent decree. Is that correct? Well, we were asking for additional time. The report stopped. Not yet complied. Yes. Yes. The report stopped. Sandy now comes as if it couldn't get any worse. Sandy hits in October of 2012. Our reports stop. We don't give a report for October, November, December, and I don't believe we give January, but we're in communication with them explaining the lead counsel on this is opening emergency shelters, three emergency shelters, as demonstrated by the affirmation that's before you. In addition, he's a volunteer fireman. He's going out 30 times a night during this extreme emergency. The county, I lived in Plainview. I had no power. I was showering in my country club. I was running out of gas. I had to stop doing that. But it was a tough time, and they were attempting to comply. Actually, in February of 2015, they did give him all the back reports, those four months. That's the same day they filed the contempt proceeding. Now, the contempt proceeding was pretty much immediately dismissed by Judge Feuerstein, and it was given to Grace Moran, a referee, to oversee and try to work out what was to occur. Now, overseeing involved negotiation, I'm told, by Pablo Hernandez. I wasn't there, Your Honors. That most of the negotiations centered around 100 percent compliance or 93 percent the county proposed. I think it was ultimately settled at 96 percent. But if Your Honors would look at the record JA57 of the joint appendix, there are the attorneys' hours. The hours for this motion, in defense of a cross motion, and these nine meetings with Grace Moran, which took about two to three hours each, was 988 hours. Now, it reminded me of the old definition of pornography from the Supreme Court. You might not be able to describe it. You might not be able to explain what it is, but you know it when you see it. $470,000 spent for what is questionably no benefit to the class. The only thing that came out of this is they agreed on 96 percent. Doesn't the record show that the processing of the food stamp applications and the Medicaid applications significantly increased over this period of time? Without a doubt. Without a doubt. How do you say they accomplished nothing? Well, that wasn't because of the contempt proceeding. It increased because of the accomplishment of the original settlement. They received $261,000 for that. We never even appealed that. The district court, and the district judge is in the best position to evaluate these things, clearly believed that the efforts did result in a lot of progress. How do we guess that? My argument is, Your Honor, that the initial action might have accomplished that. The contempt, there were 100 defenses to the contempt aspect of it. That accomplished nothing. We were moving in that direction. We were already accomplishing what was expected of us. The contempt was totally unnecessary. A little more patience, they would have had the reports. When you look at the— The district court dismissed the contempt, but then it went into the proceedings. Yes, Your Honor. That are what generated the hours. That's not the contempt proceeding. It's collateral to it, right? That prodded the county. It wasn't something that you could put on the back burner because they were actively involved in these proceedings that ultimately resulted in the 96% settlement. I'm not sure how you can say that did not benefit their clients. Judge, I don't think we spent— Who knows when the county would have paid or what it would have paid given the difficulties you've identified. I'm not suggesting this was some kind of venal motive, but they made sure that their clients' interests were on the front rather than the back burner for the county. Well, them getting paid versus us reporting are two different things. Yes, but if the reporting had been delayed, presumably the payments would have been delayed, too. Respectfully, Judge, I'm not sure there's a correlation there. You could be making the payments and you just don't have time to generate the reports to give to the opposing side. They should have waited a little bit longer, in our humble opinion, given what was— You understand we're not reviewing this in the first instance. We are reviewing whether there was error by the district court. This is something we review for abuse of discretion, so you have to tell us that no reasonable judge could have reached the conclusions you're challenging. Judge, I was in your position for a number of years in the state court. I was loathed to ever reduce an attorney's fee because I believe attorneys have a right to make a living, but when you look at 998 hours, okay, this is additional hours from not counting the first segment of the lawsuit. This is just the contempt side of it. I was involved at Agent Orange. We didn't generate numbers like that. I mean, most respectfully, it cries out that they should not get a windfall, respectfully, if they were a private attorney, as an Arbor Hills state, okay, no client in their right mind would pay $470,000 to get—and I am here arguing, the original agreement said they will comply with the statute. To me, that means 100%, okay? They've managed to reduce it to 96%. Did that benefit the class? All right. I know you want to reserve some time for rebuttal, so let's hear from— Yes, thank you, Your Honor. Thank you. Good morning. May it please the Court, my name is Mark Cohan. I'm with the National Center for Law and Economic Justice, one of the attorneys for plaintiffs in this action. With all due respect to my learned opponent and former judge, the record simply does not support defendant's argument here. The district judge reviewed thousands of pages of documents, heard argument, read multiple briefs, conducted in-person and telephonic conferences, and supervised the special master at a granular level. This was not a case about whether or not defendant was failing to provide— $470,000 does seem high, certainly at first blush, when the original litigation generated only half that amount. The reason for that, Your Honor, is entirely within the control of the defendant and was not an abuse of discretion by the district court, who again had the advantage of the full record and the full supervision. The reason for that is defendant at every single opportunity resisted efforts at enforcement. This was not as defendant suggests. Can you give us some examples? Absolutely, Your Honor. As set forth both in the record and in detail in our brief, basically the structure of the settlement involved a ramp-up period by which defendant was supposed to get itself into position to be able to timely process benefits to eligible households and a class action concerning food stamps, Medicaid, and cash assistance. Defendant by the end of the ramp-up period did not do so. He was simply—there was evidence of hundreds, if not thousands, of applications being delayed and benefits not being paid. This was not about the reports, as the defendant suggests. We gave them complete freedom to built in and baked into the settlement agreement was the notion that they would provide emergency benefits to needy households in emergent circumstances, storms and fiscal constraints notwithstanding. This was the county's primary obligation. They failed to do so. We wrote to the county— Timeliness in that context is everything. Seven days for emergency food stamps, Your Honor. We cannot imagine a more strict mandate by the federal government in terms of compliance than to provide food stamps to a needy household within seven days of application. Here, we had evidence of applications going on for 30, 40 days not being processed. And again, hundreds. So we contacted the county. We asked for a corrective action plan. A corrective action plan was provided. We asked for indications of how the proposed corrective action plan would correlate to performance. It was very easy for them to say we'll do X, Y, and Z, but it was not clear how it would correlate to performance. They failed to continue to provide information. They simply said they needed more of a ramp-up period. They wouldn't tell us how. We asked to engage in negotiations. They refused. They said they were the ones who finally said they wanted to go before the judge. We gave them another opportunity to settle. They chose not to. We went before the judge. They resisted. They made a counter motion to just extend without any additional corrective action. The judge, contrary to defendant's assertion that she was somehow bending over backwards to accommodate plaintiffs, believed that somebody needed to get at the granular nature and conclude what was actually causing the delays. She referred it to a special master. The special master didn't just... You had made a motion for the special master. We did, Your Honor. Was that opposed? It was opposed, Your Honor, yes. That was part of the resistance. The only thing they wanted was an extension of jurisdiction. We wound up before the special master. The special master met with the defendants with us present at least nine times and had additional meetings without us present, submitted an interim report. In the record, Your Honor, the interim report is very clear. The special master doesn't look at questions like storms as the cause of de facto. She instead looks at what it is the defendant is doing and identifies lack of training, lack of supervision, failure... She found lack of compliance in certain areas. I'm sorry, Your Honor. I didn't hear. She found lack of compliance by the county in certain areas. She found significant lack of compliance. She, for example, looked at 40 applications that were late and was only able to identify for 14 of those applications in the sample applicant fault, which meant for the other 26, roughly 70-something percent, the county was at fault, and it could not identify the reason for its fault. If it were in fact... And this was long past Sandy. This was long past the process. So she basically met with the county, participated with them in very granular sort of supervision. She, in essence, became the kind of management consultant that they evidently so desperately needed and performance improved during the special master process. This is pertinent, but our primary concern is your fees. Yes, Your Honor. So just take a moment and explain to us how your fees involved more than just showing up at these nine meetings. Yes, Your Honor. As was both indicated in the special master report and in the judge's findings and as demonstrated in the submissions to the court below. And I'm touching on that because that's part of the test here is whether or not the district judge had evidence and abused the discretion in reviewing that evidence. This is your declaration that you submitted? Yes, Your Honor. We submitted extensive documentation of the work that we did in support of the proceedings before the special master. As the special master notes, for example, in one of her interim reports, one of the things we did is we provided information about what other counties were doing in order to timely comply with the processing of food stamps, cash assistance, and Medicaid mandates. We provided proposed corrective action. We consulted with outside experts. We basically were trying to provide the kinds of, we reviewed extensive monitoring and did sampling of individual cases. We were attempting to do what the county was not doing, which was to identify the causes of the delay and to propose systemic fixes to those items. We prepared monitoring in ways different than the county had in order to assist the special master and the county in showing that, for example, Superstorm Sandy had no impact on Medicaid processing and only impacted food stamps for one month. So to continue to rely on that was an invasion of responsibility. Yes, this is basically a situation where the county's position, this is institutional reform litigation. If a prison were to say, yes, we will change the number of square feet per prisoner, and then you spend three years making it happen, getting the settlement was easy. Getting the outcome was hard. It was only after we had continued to meet proposed solutions, prepare before the special master, work through the review process, and ultimately come up with a solution that they did what they needed to do. And the district judge had the full record. As Your Honor correctly points out, the test here isn't whether or not any one of you might choose to do something differently. The test is whether or not they can point to something that Judge Feuestein did that is an abuse of discretion. And the size of the award is not in and of itself an abuse of discretion. The question is, did the district judge review the time spent, which she does, review the activities that correlate to that, which she does, and come to a finding, which she did? It still has to be a reasonable fee in the end. Yes, Your Honor. But here, the determination of reasonableness ties to a question of whether or not it's an abuse of discretion. It doesn't, again, tie to whether or not any one of us might review it and come to a different conclusion. We would submit here the test of reasonableness is easily satisfied based on the quantum of work necessary to achieve the results, as indicated by the record. And the record spans three volumes, and that's only a portion of the record that was before the district court. But as indicated by the record, multiple court appearances, multiple multi-paragraph submissions, conferences, phone calls, in-person meetings, at least nine meetings before the special master, additional material submitted to the special master, additional material submitted to the district court. This was a very vigorous attempt to enforce a program where people's lives were at stake. And that's, I think, one of the things that the district judge did not lose sight of in terms of the degree to which she was willing to keep the pressure on the defendant and allow us to keep the pressure on the defendant to achieve the result. And again, this has absolutely nothing to do with the question of whether or not we were being supplied monitoring reports in a timely fashion. We understood the delays in the provision of reports, and that was never a problem. And, Your Honor, a couple of other things that defendant points to as part of its argument. It fails to identify, and this goes to Judge Chinn's question about reasonableness, it doesn't like the overall quantum, but it fails to identify a single hour that it believes was inappropriately spent by plaintiff's counsel in this action. It had the opportunity to do so before the district judge. You're saying that they have not made a specific challenge to a specific... That is correct, Your Honor. Part of what their burden was and what they readily could have done before the district court is they could have said, for example, Attorney Cohen, that would be myself, Your Honor, spent six hours on this day writing that brief. That brief was unnecessary. That was an abusive time. They didn't do that kind of breakdown. As I take it, they just say this big amount is just too much. It's just they're uncomfortable. They don't like it. It's an outcome with which they are not happy. And this is not the first time in this case that this occurred. On the first fee application, the judge gave them a second opportunity to submit a more detailed objection to the hours that they claimed that we were submitting that were excessive. They failed to do so on that application as well. And as a consequence, the judge granted us fairly close to the full amount requested. I don't think there's anybody in the Second Circuit, Eastern District, who would view Judge Feuerstein as somebody who writes a blank check at the expense of the taxpayer. I think she's a very careful judge who would demand full documentation before her. We met that full documentation obligation. With all due respect, defendant did not. He didn't do it before Judge Feuerstein. And in the briefing before you all, he fails to identify the kind of time that would make the work being done unreasonable. The test here isn't whether or not the fees are unreasonable. The test is whether or not the fees correlate to the work and whether or not the work was and Judge Feuerstein had the full record before her and was fully entitled to determine whether or not the amount of time spent by plaintiff's counsel in pursuit of the outcome was, in fact, reasonable. Thank you. Thank you very much, Your Honor. All right. We're going to take the matter. Oh, no, I'm sorry. Mr. Fellow, you have rebuttal. I apologize. Three minutes you've reserved. Is this mine or yours? Is this mine or yours? If I might, Your Honor, if you look at record JA 101, April 22nd, there's a 10 a.m. entry, 10.06 p.m. entry. There's a gross example. That was meant to be six minutes. Did you point this out? The problem that I see is that I think it was incumbent on you or your client to point out and make specific challenges and instead, I take it, but you can correct me if you think I'm wrong, what you said was this amount, broadly speaking, is just too high. Well, the number of hours is certainly too high. But did you point out specific hours that were problematic? Well, a great deal of the monitoring is confusing to the legal profession. We don't see that in a normal motion. So maybe my colleagues, in drawing their briefs, had believed that it would go to a hearing, and at the hearing, we'd get to go line by line and expose and find out what some of these entries are because we don't even know. Did you ask for a hearing? Did you ask for a hearing? Did you ask for discovery about this? The hours? I'd be lying if I said I knew. I suspect we did. I suspect we did. I mean, why wouldn't we have? I'll ask for it now. I mean . . . No one's shaking their head no, so . . . It's too late to ask for it now. Did you ask the district judge for a discovery, for a hearing on the hours, the fees? I'm not certain, Your Honor. I don't know the answer to that. You were about to . . . If it was a no, I would certainly say it. I just don't know. You were about to make a point about a specific entry. Did you do any of that in front of the district court? Did you say, this looks like it's 12 hours on this one day, and that's too much? I would imagine we did not, Your Honor. So isn't it too late to be doing that now? No. No? Okay. Thank you. Thank you. All right, we're going to take the case under advisement.